IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
GLORIA VILLANUEVA,              )
                                )
              Plaintiff,        )
                                )
    v.                          )     No.  07 C 4626
                                )
VILLAGE DISCOUNT OUTLET, INC.,  )
                                )
              Defendant.        )
```

MEMORANDUM OPINION AND ORDER

Gloria Villanueva ("Villanueva") has sued her former employer, Village Discount Outlet, Inc. ("Village Discount"), asserting charges of national origin discrimination, retaliatory discharge and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§2000e to 2000e-17) and retaliatory discharge for reporting illegal business activities in violation of Illinois law. Village Discount has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and the motion has been fully briefed. For the reasons stated here, the Rule 56 motion is granted.

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir.

2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

This District Court has implemented Rule 56 through its LR 56.1, which requires both sides to submit factual statements supported by record evidence.[1] Importantly, LR 56.1(b)(3) requires any nonmovant (such as Villanueva) who seeks to avoid summary judgment to file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." In addition the nonmovant is required to submit a "statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment..." (id.).

Villanueva has failed to comply with LR 56.1. She has filed neither the required response to Village Discount's LR 56.1(a)(3)

---

[1] This opinion identifies Village Discount's and Villanueva's submissions as "Village Discount" and "V.," respectively. To the extent that either party has submitted items without appropriate designations, this opinion has attempted to cite them in the clearest manner possible.

statement nor a statement of additional facts. Instead she has submitted a single document, a memorandum of law in opposition to Village Discount's motion for summary judgment, largely consisting of a factual recitation (thankfully with citations to the record).

LR 56.1's enforcement provision states that "all material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." And our Court of Appeals has "consistently held that failure to respond by the nonmovant as mandated by the local rules results in an admission" (Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003)).

While this Court would thus be well justified in treating all facts in Village Discount's LR 56.1(a)(3) statement as admitted and in refusing to consider any of the facts submitted by Villanueva in her memorandum of law (see Cichon v. Exelon Generation Co., 401 F.3d 803, 809-10 (7th Cir. 2005)), such an evidentiary death sentence is unnecessary.[2] Even when Villanueva's claims are considered in light of all admissible

---

[2] Village Discount's submissions are not spectacular, either, omitting many background facts and leaving it to this Court to ferret out information from the record. As United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991))--adapted to this case--has said:

> Judges are not like pigs, hunting for truffles buried in [the record].

3

evidence that she has tendered, she does not survive Village Discount's motion.[3]

**Background**

Villanueva is a Hispanic woman of Mexican national origin who began working for Village Discount in 1992 (Village Discount St. ¶1; V. R. Mem. 1). Village Discount is a purveyor of used merchandise, which it obtains through donations to various charities. It collects, stores and sells the merchandise and remits a set fee to the charities per contract (Village Discount St. ¶2; V. R. Mem. 4). To facilitate the collection of merchandise, Village Discount operates a number of collection locations (called Plaza Sites) at retail centers in the Chicago Metropolitan Area (Village Discount St. ¶2). It also handles residential pick-ups of donations and operates a warehouse and several retail stores (id.).

In July 2002, after holding a number of positions for Village Discount in its retail stores and at its Blue Island headquarters, Villanueva was promoted to Assistant Plaza Sites Manager ("Assistant Manager") (id. ¶3; V. R. Mem. 1-2).

---

[3] In the summary judgment context, of course, Villanueva's burden is only that of creating reasonable inferences, not one of proof as such (see, e.g., Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)). Nonetheless this opinion employs such locutions as "prove," "show" or "establish" because the cases typically use those shorthand expressions--but the burden this Court has imposed on Villanueva is the less demanding one stated at the outset of this footnote.

4

Assistant Managers assist in the oversight and management of the Plaza Sites (Village Discount St. ¶12). Because an Assistant Manager is required to visit the Plaza Sites, Villanueva was given the use of a company vehicle (id. ¶11).

Villanueva's immediate predecessor in the position, Nikki Mills ("Mills") had originally used her own car and was then reimbursed for her mileage. While Mills was still with Village Discount, it changed that practice and made company vehicles available to Assistant Managers (Village Discount St. ¶7, 9; V. R. Mem. 2). Villanueva and Mills were paid the same rate--$10.60 an hour--and each was paid for overtime worked (Village Discount St. ¶6, 8; V. Ex. 2 at 77; V. Ex. 4 at 252). Mills had worked as a driver for Village Discount before serving as an Assistant Manager, and she exercised an option to return to that position after working as an Assistant Manager for about 11 months (Village Discount St. ¶10; V. R. Mem. 2).

While she was an Assistant Manager, Villanueva's direct supervisor was Darrell Carden ("Carden"), the Plaza Sites Manager (Village Discount St. ¶4; V. R. Mem. 2). Both Villanueva and Carden also reported to Village Discount's Vice-President Tom Foley ("Foley") and to its President James Stinnet ("Stinnet") (Village Discount St. ¶4; Village Discount Ex. I; see V. Ex. 2 at 83-85). Villanueva and Carden also interacted with Gary Gullickson ("Gullickson"), the Plaza Sites Coordinator (V. Ex. 5

5

at 6-7).[4] Despite Gullickson's involvement with the Plaza Sites, Villanueva did not report to him and he was not her supervisor (V. Ex. 2 at 85). Villanueva and Carden met with Foley and Stinnet in regular Tuesday morning meetings (Village Discount St. ¶35).

Villanueva kept her own time records, and Carden reviewed her time sheets before they were submitted for each pay period (V. R. Mem. 5). Villanueva also maintained a log report "for time management and verification of job duties completed" (Villanueva Tr. 133; see V. Ex. 2 at 66) for some period of time (including January through May 2006) while she served as an Assistant Manager. She recorded consistent "begin" and "end" hours on her logs and on her time sheets for April and May 2006 (Village Discount Exs. H-K; Villanueva Tr. 133; V. Ex. 4 at 80-88; V. Ex. 6 at 116-20).

Villanueva's duties also required her to coordinate with the Village Discount warehouse to have a driver pick up full collection trailers and deliver empty ones (see Village Discount St. ¶41; V. R. Mem. 3). That duty required her to interact on occasion with Village Discount's warehouse manager Roy Hathaway, Sr. ("Hathaway Sr.") and with its truck drivers, including Roy Hathaway, Jr. ("Hathaway Jr.") (Village Discount St. ¶41; V. R.

---

[4] Despite Gullickson's involvement, neither party has explained who he is, leaving this Court to figure it out on its own.

6

Mem. 3).

By all accounts there was no love lost between the Hathaways and Villanueva. According to Villanueva, on at least two occasions Hathaway Jr. drove his truck close enough to her so that she believed he was trying to run her over (V. R. Mem. 3). On another occasion in the fall of 2005, he pantomimed using his hand as a gun and pulling the trigger in Villanueva's direction (id.). Villanueva complained to Carden and eventually to Stinnet after the finger-gun incident, after which Hathaway Jr.'s threatening behavior stopped (id. at 3-4; V. Ex. 2 at 115-20).

But after that Hathaway Sr. began to act aggressively toward Villanueva, telling her he would "kick [her] Mexican ass" and inviting her to fight him with her "Mexican gang" (V. R. Mem. 12; see V. Ex. 2 at 112, 120). Villanueva also testified that Hathaway Sr. interfered with her ability to do her job by refusing to send empty collection trailers to the Plaza Sites when they were needed (V. R. Mem. 12; V. Ex. 2 at 279-80). She complained about that behavior to Carden, who reported it to Foley (V. R. Mem. 12; V. Ex. 2 at 281; V. Ex. 7 at 432).

Villanueva also apparently had a confrontation with Foley during which he called her a "lazy Mexican" after disagreeing with her handling of a complaint (V. R. Mem. 3; Village Discount Mem. 11; V. Ex. 2 at 424-27). Foley also reportedly made derogatory comments about Villanueva's daughter, who is disabled,

7

calling her a "retard" and a "spaz" (V. R. Mem. 3; V. Ex. 4 at 178, 271-73)  Villanueva also testified that Foley often made general derogatory comments about Mexicans, saying "Mexicans just like to get drunk," "Mexicans are lazy," "Mexicans just like to get laid" and "Mexicans don't do their jobs" (V. R. Mem. 3; V. Ex. 2 at 92-97; V. Ex. 7 at 427-28).  But Villanueva did not report that behavior to Stinnet (V. Ex. 2 at 99-100).

Villanueva and Carden were working on a budget for the Plaza Sites in November 2005 and accessed Village archives for that purpose (V. R. Mem. 14; V. Ex. 4 at 185-192, 238-42).  In the course of reviewing records, Carden noticed that one of the charities Village Discount contracted with appeared to be underpaid for its donations (id. at 194).  He and Villanueva reported that apparent discrepancy to Gullickson as well as to Foley and Stinnet (V. Ex. 4 at 207-10).

Several months later, in late April 2006, Village Discount installed GPS units on both Carden's and Villanueva's company cars (Village Discount St. ¶19-20; V. Ex. 6 at 87-88).  Village Discount also installed video cameras at all or almost all of the Plaza Sites because of theft problems (V. Ex. 3 at 28; V. Ex. 6 at 93).  It appears that Village Discount may have taken those steps in part because of reports that Carden was removing donated items and reselling them (V. Ex. 3 at 25-28; V. Ex. 6 at 87-88;).  Villanueva was monitored because she was part of Carden's team,

8

but Village Discount claims it did not expect the GPS records to give rise to any indication of questionable behavior by Villanueva (Village Discount St. ¶20).

On May 31, 2006 Village Discount suspended Villanueva for reporting hours not worked on her time sheet and for removing items from a collection site (Village Discount St. ¶¶15, 34, 36). Village Discount compared the information recorded by the GPS unit to Villanueva's time sheets and log reports and determined that she was at non-work locations during many of the hours she claimed to be at a Plaza Site or at Village Discount's headquarters in Blue Island (Village Discount St. ¶21-33; Village Discount Ex. H-K). Villanueva was also videotaped removing a bag of items from a Plaza Site (Village Discount St. ¶34).

Village Discount conducted an investigation and terminated Villanueva some two weeks after her suspension (Village Discount St. ¶36).[5] Villanueva timely filed her charge with the EEOC on July 24, 2006 and amended it on January 25, 2007.

### Title VII Claims

Villanueva lists four Title VII counts in her complaint, two of which--Counts 1 and 3 for "Discrimination in violation of Title VII" and "Disparate treatment/Disparate impact"--claim

---

[5] Carden was terminated around the same time, also for theft of items from a collection trailer (Village Discount St. ¶39).

employment discrimination on the basis of national origin.[6]  Her other two counts sound in hostile work environment and retaliation.

**Employment Discrimination and Retaliation**

Villanueva argues that she can prove discrimination and retaliation via the familiar multistep burden-shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[7]  Under step one a plaintiff must establish a prima facie case by showing that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) a similarly situated employee not of the protected class was treated more favorably" (Gusewelle v. City of Wood River, 374 F.3d 569, 574 (7th Cir. 2004)).  Step one is similar for a retaliation claim, requiring a showing that (1) the employee engaged in statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity (Andonissamy v. Hewlett-Packard

---

[6] Villanueva's use of the term "disparate impact" is improper.  Disparate impact claims require allegations of facially neutral employment practices that disparately impact individuals with protected characteristics, something that Villanueva has not alleged (see, e.g., Griggs v. Duke Power Co., 401 U.S. 424 (1971)).

[7] Villanueva does not argue that she can prove discrimination via the direct method.

10

Co., 547 F.3d 841, 850 (7th Cir. 2008)).

Villanueva cannot make out that prima facie case for either claim because she cannot show that a similarly situated employee was treated more favorably than she was. As Burks v. Wis. Dep't of Transp., 464 F.3d 744, 751 (7th Cir. 2006)(internal quotation marks omitted) teaches:

> [I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings.

To that end Villanueva asserts that Mills, who directly preceded her as an Assistant Manager, is the comparator in her case. But Mills was not similarly situated to Villanueva because she was never accused of time sheet falsification or of removing donations from a collection site. Villanueva argues that Mills spent unnecessary time at the warehouse during business hours while she was an Assistant Manager--the purported equivalent of time sheet falsification. But she does not provide any evidence that Mills was accused of being paid for work she did not do or that Mills was ever accused of taking donated items.

Indeed, it appears the employee who was most comparable to Villanueva was Carden. Both were responsible for the oversight and management of the Plaza Sites and, though Carden was Villanueva's supervisor, they also both reported to Foley and Stinnet. Carden was subject to the same on-the-job monitoring via GPS and video recording as Villanueva, and he was also

11

accused of taking items from a collection site. Because Carden was also suspended and terminated, Villanueva cannot show she was treated less favorably than he was. Hence Villanueva has failed to make out her prima facie case of discrimination.

**Hostile Work Environment**

Villanueva also claims that threats made to her by Hathaway Jr. and disparaging comments made by both Hathaway Sr. and Tom Foley created a hostile work environment. To survive summary judgment on that claim, Villanueva must show that (1) she was subject to unwelcome harassment, (2) the harassment was based on her national origin, (3) it was sufficiently severe or pervasive as to alter the conditions of her employment and create a hostile or abusive atmosphere and (4) there is a basis for employer liability (<u>Luckie v. Ameritech Corp.</u>, 389 F.3d 708, 713 (7th Cir. 2004)). Villanueva cannot reach back to harassing acts that antedated the 300-day limitation as a predicate for her claim unless it was not apparent to her that those earlier acts amounted to harassment until she later suffered such actions within the 300-day period (<u>Minor v. Ivy Tech State Coll.</u>, 174 F.3d 855, 857 (7th Cir. 1999)).

Villanueva points to the two occasions when she believed Hathaway Jr. tried to run her over and to the finger-gun incident

12

as evidence of hostile work environment.[8] Those actions can certainly be characterized as harassment and could be considered severe enough to alter the terms and conditions of Villanueva's employment. But Villanueva has not provided any evidence that the harassment was related to her national origin (as opposed to, say, personal animosity toward her by Hathaway Jr.). Still, with all reasonable inferences drawn in her favor and given the biased comments made by Hathaway Sr., a trier of fact might reasonably believe that the apple does not fall far from the tree and that Hathaway Jr.'s acts were based on Villanueva's national origin.[9]

Even so, Villanueva fails because she has shown no basis for <u>employer</u> liability. Hathaway Jr. had no supervisory authority over Villanueva, and Village Discount would be vicariously liable for any hostile work environment created by his threats only if it was negligent in discovering or remedying the harassment (<u>Andonissamy</u>, 547 F.3d at 848). Here Villanueva acknowledges that when she complained about Hathaway Jr.'s threats, he was reprimanded and the threats ceased (see <u>Nat'l R.R. Passenger</u>

---

[8] It is clear that the two trailer incidents occurred before the 300-day period, but they are arguably part of the same harassment as the finger "shooting."

[9] Hathaway Jr.'s animus may perhaps be attributable instead to his relationship with (and his later marriage to) Mills, Villanueva's predecessor. But neither party asserts that the relationship factored into Hathaway Jr.'s behavior, so this opinion must draw the more favorable inference for Villanueva and assume it did not.

13

Corp. v. Morgan, 536 U.S. 101, 118 (2002)).

As to the other harassing behavior to which Villanueva was subjected (even presuming that it occurred within the 300-day period), none can be said to be so severe or pervasive as to alter the terms and conditions of her employment. As Saxton v. AT&T, 10 F.3d 526, 533 (7th Cir. 1993)(internal quotation marks omitted, brackets in original) states:

> In order to create a hostile work environment, the conduct at issue must ha[ve] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

And the complained-of behavior must be both objectively and subjectively abusive (see Murray v. Chicago Transit Auth., 252 F.3d 880, 889 (7th Cir. 2001)). Because severity and pervasiveness are, to a degree, inversely related, only sufficiently severe acts can serve to outweigh the infrequency with which Villanueva encountered them (see Cerros v. Steel Techs., Inc., 398 F.3d 944, 951 (7th Cir. 2005)).

Though Villanueva claims that she heard Hathaway Sr. make biased and aggressive statements to her all the time, she also testified that her problems with him did not begin until after she complained about Hathaway Jr., suggesting that his behavior was based not on her national origin but instead on personal dislike of her for reporting his son.

Moreover, Villanueva testified that she did not often go to

14

the warehouse, so it cannot be said that Hathaway Sr.'s comments were pervasive. Indeed, though his comments were certainly offensive, Villanueva's own actions indicate that she did not consider those comments severe: It will be remembered that when Hathaway Jr. made threatening gestures to her, she reported him first to Carden, then to Foley and finally to Stinnet. But by contrast, Villanueva reported Hathaway Sr.'s comments only to Carden, who reported them to Foley--she did not take the problem directly to Stinnet, as she had vis-a-vis Hathaway, Jr.

Villanueva also alleges that Foley made disparaging comments about her national origin. On that score it seems that Foley was an all-purpose disparager: At least one of his comments referred only to Villanueva's spending time "with the wrong people," while others referred to her disabled daughter. Offensive though those statements might be, they cannot be said to be based on her national origin.

As for Foley's other and national-origin-related statements, it is difficult to characterize his concededly unacceptable behavior as so severe or pervasive as to affect Villanueva's work environment materially. Villanueva testified that she heard Foley make denigrating comments about Mexicans "several times," but when asked to testify as to a specific instance she referred only to her own confrontation with him, suggesting the comments were not as pervasive as she claims. It is true that "even one

15

act of harassment will suffice if it is egregious" (<u>Hostetler v. Quality Dining, Inc.</u>, 218 F.3d 798, 808 (7th Cir. 2000)).  But the "mere utterance of an...epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII" (<u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)(citation and internal quotation marks omitted, ellipsis in original)).

So Foley's statements, while surely reflecting bias, did not rise to the level of severity required by Title VII.  And Villanueva's own response to those statements speaks to her subjective perception--she complained only to Carden, and then only once.  Again contrast that with her multiple complaints about Hathaway Jr.  With the facts considered in the light most favorable to Villanueva and with all reasonable inferences drawn in her favor, she still falls short of showing the poisoning of the workplace necessary to allow her hostile work environment claim to survive summary judgment.

### Illinois Retaliatory Discharge Claim

Employment in Illinois is at will:  In that respect "a noncontracted employee is one who serves at the employer's will, and the employer may discharge such an employee for any reason or no reason" (<u>Zimmerman v. Buchheit of Sparta, Inc.</u>, 164 Ill. 2d 29, 32, 645 N.E.2d 877, 879 (1994)).  Illinois courts have created a "limited and narrow" exception to that general rule

16

(Turner v. Mem'l Med. Ctr., 233 Ill.2d 494, 500, 911 N.E.2d 369, 374 (2009))--it applies only when a plaintiff shows that (1) the employer discharged the employee, (2) the discharge was in retaliation for the employee's activities and (3) the discharge "violates a clear mandate of public policy" (id.). "Clearly mandated public policy," while not precisely defined by the Illinois courts, must "strike at the heart of a citizen's social rights, duties, and responsibilities" (Palmateer v. Int'l Harvester Co., 85 Ill. 2d 124, 130, 421 N.E.2d 876, 878-79 (1981)).

Villanueva claims that she was discharged in retaliation for her involvement in reporting suspected fraud by Village Discount.[10] Along with Carden, she reported what appeared to be evidence that Village Discount underpaid one of the charities with which it contracts. Carden determined that a discrepancy existed while reviewing records with Villanueva, and she was present when he reported it to Gullickson and then to Foley. Several months later Villanueva and Carden were both terminated.

Both parties focus on the question whether reporting

---

[10] Villanueva also suggests that Village Discount discharged her in retaliation for her reporting Hathaway Jr.'s threats to her supervisors. This opinion need not address that claim, for Villanueva cannot establish a causal connection between her complaints and her discharge. Hathaway Jr.'s threats ceased once she reported him to Stinnet, several months before her discharge.

suspected fraud touches on a clear mandate of public policy.[11]
But that question is irrelevant if Villanueva's discharge was not
retaliatory. For that purpose this Court must analyze her claims
using the direct method rather than the indirect McDonnell
Douglas framework.[12]

Villanueva relies on two pieces of evidence on that score.
Neither does the job.

First, she points to Foley's testimony stating "the word
budget is not in the vocabulary when it comes to [Carden] and
[Villanueva]" (V. Ex. 3 at 184-85) to suggest that a fact issue
exists as to whether she had access to records that would show
the reported discrepancy. But she glosses over Foley's follow-up
testimony in which he confirmed that she was allowed access to
archived Village Discount records to support a request for more
hours for her staff (V. Ex. 3 at 190-91). That Foley did not
consider her to be developing a "budget" does not raise a fact
issue when it is plain that at some point she was allowed to
access Village Discount archives.

---

[11] Seventh Circuit cases dealing with Illinois retaliatory discharge claims have made it clear that reporting suspected unlawful activity by one's employer falls within a clear mandate of public policy (see cases cited in Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd., 277 F.3d 936, 940-41 (7th Cir. 2002)).

[12] As with her Title VII claims of discrimination and retaliation, the indirect method would fail because Villanueva cannot show that a similarly situated employee was treated more favorably.

Second, Villanueva attempts to show evidence of suspicious timing by noting that she and Carden were terminated "within months" of Gullickson's attempt to follow up with Foley about the reported discrepancy (V. R. Mem. 15). But suspicious timing alone does not suffice to support a reasonable inference of retaliation (<u>Sauzek v. Exxon Coal USA, Inc.</u>, 202 F.3d 913, 918 (7th Cir. 2000)). Villanueva has not, then, raised an issue of fact sufficient to survive summary judgment on her claim of retaliatory discharge under Illinois law.

## Conclusion

With no genuine issue of material fact having been identified, Village Discount is entitled to a judgment as a matter of law on all of Villanueva's claims. Its Rule 56 motion is granted, and this action is dismissed with prejudice.

_____
Milton I. Shadur
Senior United States District Judge

Date: October 28, 2009